**Nathaniel JACKSON, Odell Glover, George Smith, et al., Plaintiffs,**

**v.**

**EDGEFIELD COUNTY, SOUTH CAROLINA SCHOOL DISTRICT; Edgefield County, South Carolina School District Board of Trustees, Everett W. Noel, H.S. Crouch, Ben D. Clark, Willie P. Lewis, Raymond Cook, Joe Bunch, Virgil Wall, Individually and as Chairman and Members, Respectively of the Edgefield County School District Board of Trustees, Defendants.**

**Civ. A. No. 9:85-709-3.**

United States District Court, D. South Carolina, Greenwood Division.

Sept. 29, 1986.

Laughlin McDonald, Neil Bradley, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., and Herbert E. Buhl, III, Columbia, S.C., for plaintiffs.

Bruce E. Davis, Camden, S.C., Jim Richardson, Columbia, S.C., for defendants.

MEMORANDUM OPINION AND ORDER

WESLEY E. BROWN, Senior District Judge, Assigned.

I. INTRODUCTION

This is a vote dilution case. Plaintiffs are black citizens and registered voters of Edgefield County, South Carolina. Defendants are the Edgefield County, South Carolina School District, the Edgefield County, South Carolina School District Board of Trustees, the members of the Board of Trustees who are Everett W. Noel, H.S. Crouch, Ben D. Clark, William P. Lewis, Raymond Cook, Joe Bunch and Virgil Wall, and the Edgefield County, South Carolina Board of Election Commissioners. The lawsuit involves challenges to the at-large electoral system used to elect members of the Edgefield County, South Carolina, School Board. Plaintiffs contend that the present at-large electoral system for electing members of the Board of Trustees results in an impermissible dilution of the voting strength of the black voters in depriving them of their Constitutional rights secured by the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution and in violation of their statutory right provided under Section 2 of the Voting Rights Act of 1965, *as amended,* 96 Stat. 134, 42 U.S.C. Sec. 1973 (1982). Plaintiffs seek (1) a declaratory judgment that the present at-large method of electing members of the Board of Trustees is in violation of their Constitutional and statutory rights; (2) a permanent injunction forbidding the holding of future School Board elections under the at-large system; and (3) an order directing the defendants to submit new electoral procedures and plans to the Department of Justice for preclearance under Section 5 of the Civil Rights Act of 1965, 42 U.S.C. Sec. 1973c, subject to final approval by the Court, for elections of Edgefield County School District Board of Trustees as effective remedy for such violations.

The defendants contend that the present at-large means for electing members of the Board of Trustees does not have any dilutive effects or results in abridging the voting strength of the black citizens in Edgefield County so as to constitute any denial of their rights to equal access to the political processes and to equal opportunity to elect representatives of their preferred choice. The defendants contend that the essence of plaintiffs' complaint amounts to an impermissible assertion for racial proportionality in School Board membership, and such a demand is specifically prohibited under Section 2 of the Voting Rights Act of 1965, *as amended,* 42 U.S.C. Sec. 1973(b) (1982).

In a Pre-trial Conference, the parties stipulated to much of the statistical data on election returns, voter registrations and

census reports, and the historical facts on past discrimination in South Carolina. The parties also agreed that the Court may take judicial notice of the adjudicative facts reported in various judicial opinions on civil rights litigation in South Carolina. Of course, Rule 201(b), F.R.Evid., allows the Court to do so. The substances of these stipulations, subject to objections on and determination of relevancy and materiality, will be accepted by the Court as a part of this Opinion. The Court has considered the testimony adduced at trial, the documentary evidence and factual stipulations introduced into the record, the briefs of the parties and the applicable law. This Opinion shall constitute the Court's findings of fact and conclusions of law, as required by Rule 52(a), F.R.Civ.P.

## II. THE PARTIES

Plaintiffs Nathaniel Jackson, Odell Glover, and George Smith are black adult citizens and registered voters of Edgefield County, South Carolina. Defendants are the Edgefield County, South Carolina, School District; the Edgefield County, South Carolina, School District Board of Trustees; the members of the Board of Trustees; and the Edgefield County, South Carolina, Board of Election Commissioners. Stip. 1, 2.

The central authority of the public education system of the Edgefield County School District is vested in and exercised by the Board of Trustees. Before 1968, the Board, consisting of seven members, was appointed by the Governor upon the advice of the County's legislative delegation. Terms of the office were staggered and for four years. Stip. 3. In 1968, the State legislature changed the appointive system. The statute requires that the seven-member Board be elected at-large by voters in the County and the terms of the office were staggered for six years. Stip. 4. Since 1968, the statute was amended three times. In 1969, the State legislature enacted an amendment which provides for residency districts from which candidates for the Board must run. Stip. 5. In 1974, the method of filling vacancies that arise on the Board between elections was changed from appointment by the Governor to election for the unexpired term at the next regularly scheduled elections. Stip. 6. In 1976, the date of the School Board elections was changed to be held along with the regular primary and general elections. Stip. 7. The seven members of the Board who are named in this suit are Everett W. Noel, H.S. Crouch, Ben D. Clark, William P. Lewis, Raymond Cook, Joe Bunch, and Virgil Wall. Stip. 2.

## III. THE GEOGRAPHY AND DEMOGRAPHY OF EDGEFIELD COUNTY

Edgefield County is located in the western region of South Carolina along the Savannah River. Edgefield County ranks 37th in size with 482 square miles among 46 counties in South Carolina. Pltf. Exh. 32, at 7, # 15. The County is predominantly a rural area. Peach farming is a major agricultural activity in the County. The major population centers of the County are found in three towns, Edgefield, Johnston, and Trenton.

The black population within the County peaked and was in majority during the Reconstruction Period. It has declined since that time and throughout this century. The rate of decline, steepest during the 1960's, stablized somewhat during the 1970's. But it is expected that this trend of attrition in black population will continue. O. Burton, Vol. III at 177–179. In 1970, Edgefield County's population was 8,104 black and 7,586 white. The total voting age population was 9,364, of which 4,167 (44.5%) were black and 5,195 (55.5%) were white. Pltf. Exh. 32 at 7, # 12. According to the 1980 census report, there were 17,528 persons in Edgefield County. Among these, 8,753 (49.9%) were white, 8,725 (49.8%) were black, and the remaining 50 (0.3%) were of other races. The white population of the County recounted in this report numerically exceeded that of the black by 28 persons. In looking at the various age distributions of the County

population shown on the same report whose age groups were 18 years and older, there were 11,847 persons in this voting age category. Of this number, 6,436 (54.3%) were white and 5,379 (45.4%) were black. Pltf. Exh. 1.

## IV. PAST RACIAL DISCRIMINATION AND ITS PRESENT DAY EFFECTS

Under the commands of federal civil rights law and the close scrutiny by the federal courts, there are progresses made toward racial equality in South Carolina. These relatively recent achievements, however, have not purged the continuing adverse effects of past racial discrimination on black citizens' ability to participate effectively on an equal basis in political affairs under certain circumstances in Edgefield County and in the State. Indeed, defendants have acknowledged that "Jim Crow was a way of life in Edgefield County for a hundred years after the Civil War," and that the "millennium has not arrived in Edgefield County (or elsewhere) in race relations." Under the "results" standard of Section 2 of the Voting Rights Act, a review of the history on racial discrimination in South Carolina is a useful starting point in fathoming the degree of its lingering effects that impairs the present day ability of blacks to participate on an equal basis in the political processes.

### A. *Registering and Voting*

Before the Civil War, the right to vote was conferred exclusively upon white males. Blacks were not allowed to vote until the post-Civil War Reconstruction era. Stip. 16. Pltf. Exhs. 107–109. To discourage blacks from registering to vote and their access to the determinative elections, not only there were discriminatory registration and balloting procedures created by the State, but also there were incidents of physical intimidation and violence exhibited by organized groups of white supremacists in Edgefield County. *See* Stip. 18, 19; O. Burton, Vol. III at 130–133. In 1895, the State held a Constitutional Convention. Pltf. Exh. 161. Taking from the resolutions adopted at the Convention, the State enacted several statutes on requirements for voting, including literacy test, Pltf. Exh. 110, poll tax, Pltf. Exh. 119. It has been made clear by judicial declarations that the purpose and effect of these requirements was to disfranchise blacks' right to vote. During the same period in 1890's, the State also passed laws which authorized the Governor to appoint officials to local governing bodies upon the recommendation of the local senator and representatives. *See* 1893 S.C. Acts 481, 483, No. 320; 1899 S.C. Acts 1, 2, No. 1; 1899 Acts 113, 113–14, No. 86. It appears that this appointive system was used to select members to the School Board in Edgefield County until it was supplanted by an amendment in 1968 which requires them be elected under the at-large electoral scheme. Deft. Exh. 47 at 1. From approximately 1900 to 1945, virtually no blacks were registered to vote in Edgefield County because of the various official and unofficials strategems sanctioned and brooked by the State to disfranchise blacks since the 1895 State Constitutional Convention. Stip. 21.

The Supreme Court in *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), struck down state laws that provided all-white primary elections. In response to the *Smith* decision, the State General Assembly repealed a number of statutes all relating to State regulation of primary elections. *See* Pltf. Exh. 140. The State believed that, having completely renounced its involvement with political parties and primaries, the primary elections that were conducted under the rules prescribed by the Democratic Party were purely private matters, which would not be subject to judicial scrutiny. This attempt to perpetuate the all-white primary electoral process by the State through the use of the dominant political party that "absolutely controlled the choice of elective officers in South Carolina" was declared illegal in *Elmore v. Rice,* 72 F.Supp. 516 (E.D.S.C.), *aff'd,* 165 F.2d 387 (4th Cir.1947). After 1947, it became possible but difficult for blacks to register to vote in Edgefield

County. A number of plaintiffs' witnesses recalled during the 50's and into the mid-60's that the principal obstacle to completing the process for voter registration was the hostility displayed by the white registration clerks. Gordon, Vol. II at 19–20; Jackson, Vol. II at 136; J. McCain, Vol. III at 6–8; Owens, Vol. III at 69–70. Prior to 1965, only 650 of 3,764 blacks (17.3%) who belonged to the age-eligible groups were registered to vote, while 3,950 of 4,103 whites (96.3%) were registered voters in Edgefield County. Pltf. Exh. 172. Since 1965, black voter registration has increased substantially in Edgefield County, largely because of the organized efforts conducted by the Community Action for Full Citizenship ("CAFC"), a black community civic group. T. McCain, Vol. I at 8, 22. Another contributing factor is, and plaintiffs agree that the actions at the registrar's office to discourage blacks from registering no longer existed today. Voter registration is open and accessible to the citizens of the County. In the past three years, the registrar's office responded to the requests from the black community to set up satellite sites throughout the County to assist registrations. Deft. Exh. 42. At the present time, black citizens in Edgefield County registered in greater numbers, as a proportional ratio of voting age population between these two races, than do white citizens. Stip. 25; Pltf. Exh. 252; Deft. Exh. 4; Stanley, Vol. VI at 147–148. Despite the increased voter registration in the black community over the past 15 years, blacks not only remain a minority (46.9%) of the total number of registered voters (53% for whites) as of January 1986, Stip. 26; Pltf. Exh. 252 at 2, but the turnout of blacks in the primary and general elections between 1972 and 1982, both as a percent of the total voters and a percent of registered voters, is lower than that of the white voters. Stip. 27; Pltf. Exh. 251.

There is a dispute by the partisan expert witnesses on the accuracy of voter turnout statistics on the 1984 Democratic primary and runoff elections. The South Carolina Election Commission reported that blacks comprised of a 50.1% majority of the actual voters. Deft. Exh. 53; Pltf. Exh. 98. While noting that black registered voters were 47% of the total voters in Edgefield County, defendants' expert witness is of the view that the black voters constituted a majority of voter turnout on the election day for the 1984 Democratic primary and runoff. Stanley, Vol. VI at 146. Drawing from the view of their expert witness, defendants contend that the parity between black and white voter turnout, as shown in the 1984 Democratic primary and runoff, has been reached by the black citizens of the Edgefield County.

■ Plaintiffs challenge the validity and reliability of the voter turnout statistics as reported by the South Carolina Election Commission on the 1984 Democratic primary and runoff elections. The records of the State Election Commission reveal that there were two primary election contests, one held in June (the first primary) and the other one was in October (the runoff) in 1984. The statistics, however, reflect that the aggregate number of black voters who voted in both primary and runoff contests. O. Burton, Vol. III at 171–172. The Election Commission did not and could not provide, upon a request by plaintiffs' expert witness, a set of black voter turnout statistics for each of the contests held in the 1984 Democratic primary election. *Id.* at 173. By relying upon the claimed parity of the total number of black voter turnout in the 1984 primary, the strength of the defendants' argument that a sustainable gain in blacks' electoral participations could be projected becomes even more questionable when the turnout rates for black and white voters were 44.7% and 55.2%, respectively, in the General Election held in November of the same year. Plft. Exh. 251 at 2; Pltf. Exh. 258. We agree with the plaintiffs' view and find that there is no credible factual basis to conclude that black voter turnout was in the majority in either one or both of these primary election contests in 1984.

B. *The Democratic Party Affairs in Edgefield County*

The political landscape has substantially remained unchanged since the Court of Appeals in *Rice v. Elmore, supra,* noted that

"For half a century or more the Democratic Party has absolutely controlled the choice of elective officers in the State of South Carolina. The real elections within that state have been contests within the Democratic Party, the general elections serving only to ratify and give legal validity to the party choice." 165 F.2d at 388.

The truism of this observation also summarizes the political history of Edgefield County, whose body politic has been dominated by true-blue officials elected from the nominations of the Democratic Party. While the exclusion of black citizens from participation in the Democratic primaries on the basis of race was repeatedly declared illegal following the *Rice v. Elmore* decision in 1947, the significance of their involvements in Edgefield County politics began to increase only after the passage of the Voting Rights Act of 1965.

The State law of South Carolina provides that each precinct elects its own party officers, an executive committeeman, and delegates to the county convention. S.C.Secs. 7-9-30 and 7-9-70. The executive committeemen from all of the precincts of a county are organized to form a county committee which is headed by a county chairman, who is elected by the delegates to the county convention. *Id.* Sec. 7-9-60. For primary elections, the county committee of the political party appoints its precinct workers for the various precincts. *Id.* Sec. 7-13-90. For the general and special elections, the Governor of the State appoints for each county three to five commissioners of election upon the recommendation of the local legislative delegation. *Id.* Sec. 7-13-70. The commissioners of the County Election Commission, in turn, appoint precinct workers for each precinct. *Id.;* Pltf. Exh. 32 at 9.

■ We have regarded that the race of those appointed to serve as precinct workers is an important factor in considering the degree of minority participation in the voting process. *McCain v. Lybrand,* No. 74-281 (D.S.C.1980), Pltf. Exh. 32 at 9. Until 1970, no blacks had ever served as precinct workers in Edgefield County. *Id.* at 8. For the 1970, 1972 and 1974 primaries, only 17 (8.1%) of a total 209 precinct workers were black. For the 1970, 1971, 1972 and 1974 general elections, only 33 (15.4%) of a total 314 precinct workers were black. For the 1974 school board election, only 4 (10.5%) of 38 precinct workers were black. *Id.* at 9. Eight of 17 precincts in Edgefield County did not have a black serve at the polling place at any of the eight elections held between 1970 and 1974. *Id.* at 10. In those precincts where black registered voters constituted a majority, the appointment of black precinct workers was disparagingly low. Only 19 (11.5%) of 172 precinct workers were black. *Id.*

As a result of the coordinated efforts conducted by CAFC, 40% of 59.8% age-eligible black registered to vote in 1974. Since that year, the percentage of black registered voters dropped below this 40 percentile only three times, 39.7% in July 1975, 39.5% in May 1976, and 39.9% in May 1978; but it has not exceeded 47.7% of those blacks who constituted 77.5% of the voting-age population in Edgefield County. Pltf. Exh. 252. Because blacks are a majority in some of the precincts and because the Democratic Party is organized on a district basis, the increased political participation of blacks at the precinct level has led to elections of black party officers and delegates to the Democratic Party County Convention. McCain, Vol. I at 36-37. T. McCain, a black and co-founder of CAFC, became a member of the county committee in 1974 and has held the elected position as the County Chairman of the Democratic Party since 1976. *Id.* In the majority black precincts, Johnston I and Trenton, there were concerted attempts by white precinct residents to forestall the elections of black party officials at the precinct reorganization meetings. Jackson, Vol. II at 84. In the 1980 precinct reorganization meeting at Johnston Precinct I, white voters captured approximately 50% of the precinct officer positions. *Id.* at 85-86. They were not successful in the precinct reorga-

nization meetings in 1982, 1984 and 1986. *Id.* at 87–88. In 1984 and 1986, the precinct officers from those majority black precincts have been dominated by blacks. Deft. Exhs. 56, 57, 71; Stanley, Vol. VI at 155–156. During the same years, six of the eleven party officer positions (Chairman; the 1st, 2nd, and 3rd Vice Chairman; the Secretary; the Treasurer; the Finance Director; and Executive Committeeman; the 1st Alternate Committeeman; and two State Committee members) in Edgefield County Democratic Party were occupied by blacks. Deft. Exh. 50; Stanley, Vol. VI at 154–155. The percentage of blacks appointed by the County Committee to serve as poll workers at the Democratic primaries and runoffs exceeded that of white workers, for the first time in Edgefield County in 1980, and again in 1982 and 1984. Deft. Exh. 51. For the general elections between 1976 and 1984, where poll workers were appointed by the County Election Commissioners, the overall percentage of blacks, however, was only approximately one-third of the white appointees. Deft. Exh. 52; *see also* Jackson, Vol. II at 91–93.

C. *The Extent of Past De Jure Segregation*

The post-Civil War history of South Carolina has demonstrated that there were policies of racial discrimination, either officially or tacitly endorsed by the State, against blacks in practically all areas of their common life. Until the mid–1960's, the State had enforced a number of discriminatory statutes aimed to perpetuate racial segregation, e.g., marriage, Pltf. Exhs. 113, 115; education, Pltf. Exhs. 111, 112, 118, 121, 127, 133, 139, 141, 142, 143, 144, 149, 152 and 156; public accomodations, Pltf. Exhs. 131, 137, 150; business licensing, Pltf. Exh. 136; private and public employment, Pltf. Exhs. 130, 146. The degree of discrimination against blacks, in the words of defendants, was "nowhere worse than in Edgefield County." The Edgefield County Council maintained a policy of segregated chain gangs on the basis of race until it was challenged and enjoined in a federal suit in 1971. *See Carracter v. Morgan,* Civ. No. 71–314 (D.S.C.1971) (Hemphill, J.); Pltf. Exhs. 12, 13. Blacks were purposely excluded from jury duty in Edgefield County. As late as 1970, the grand jury had no blacks at all, while the trial jury venires had only a few blacks. It was not until a federal suit was brought in 1971 that the jury list was reconstituted to include blacks on a lawful basis. Stip. 31; *Bright v. Thurmond,* Civ. No. 71–459 (D.S.C.1971); *see also* Pltf. Exh. 14. Employment of blacks by the County Government, as the Court found in *McCain v. Lybrand, supra,* was negligible until the eve of the trial of that case in 1975. Pltf. Exh. 32 at 13.

The manner in which the Edgefield County officials implemented the federal mandates to eradicate various forms of unlawful discrimination was exemplary of the intransigence demonstrated by the State's willingness to comply with the requirements. Despite the condemnation by the Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873, 881 (1954) that the doctrine of " 'separate but equal' has no place" in the area of public education, the implementation of appropriate policies to desegregate public schools in Edgefield County did not take place until 1970. Stip. 32. Prior to that time and since 1954, the School Board experimented with the "freedom of choice" plan and the "developmental school" program. For those black children who chose to attend the formerly all-white student school, they were assigned to ride in segregated all-black buses first, and later to take segregated seats on the same bus with white students to the school of their choice. *See* Stevens, Vol. II at 68–73. The "freedom of choice" plan did not receive any significant support from the black community. It resulted in fewer than 3% of the black students attending school with white students. Pltf. Exh. 32 at 15.

On April 15, 1969, the South Carolina School Desegregation Consulting Center recommended a plan for desegregating Edgefield County public schools by designating the formerly all-black W.E. Parker High School as the county high school for

the integration. Pltf. Exh. 173. The School Board rejected this proposal in 1970. Instead, it decided to implement a desegregation plan using the formerly all-white Strom Thurmond High School as the county high school for grades 9 through 12, and designating W.E. Parker High as a "developmental school" for students whose scholastic deficiencies, as determined on the basis of tests and other factors, required remedial education before admitting to the integrated county high school. Pltf. Exh. 174; Stip. 34. The projected enrollment of the developmental school was 1,200 students, 80% of whom were black. *Id.*

The Department of Health, Education and Welfare approved the developmental school concept, but only upon the condition that "the percentage of Negro students enrolled will at no time exceed five percent more than the overall percentage of Negro students" in the entire public school system in Edgefield County. Pltf. Exh. 175. There were objections from the black community as to the efficacy of the developmental school concept. McCain, Vol. I at 11. Just before the opening of the 1970–1971 school year, the School Board abandoned the developmental school concept, which at that time was renamed as "Progressive School," and came up with an alternative desegregation plan. *Id.* at 13–14. In it, the School Board designated all public schools in Edgefield County for admissions of all students. Pltf. Exh. 177.

During the first few years of desegregation of the public schools in Edgefield County, it was fraught with bitter dissension at the schools and within the black and white community. In response to the plans for integration at public schools, some leading citizens from the white community established a private school, the Francis Hugh Wardlaw Academy, in 1970. Pltf. Exh. 259. The Academy has not admitted a black student. Stip. 33. On the other hand, there was an effort by the majority of the School Board members to preserve the racial character of the schools. While Strom Thurmond High was designated as a unitary school under the 1970 desegregation plan, Stip. 37, it retained the symbols and customs, e.g., "Confederate Rebel" and "Dixie" as the school nickname and school song, and allowed them be displayed at the athletic and school sponsored events. *See* Pltf. Exh. 179; McCain, Vol. I at 15–16. Black citizens complained to the School Board that the retention of these antebellum relics was meant to defy the implementation of the desegregation policies. McCain, *id.* at 16. Supported by CAFC, some black students boycotted these school events while others from the black community picketed on the school grounds. *Id.* at 16–17. In response, the School Board obtained an *ex parte* restraining order from a State court against CAFC, T. McCain and those who participated in complaining the use of these symbols at Strom Thurmond High. The restraining order enjoined them from gathering and demonstrating against the school policies. Pltf. Exh. 15. On the same date as it secured the restraining order, the School Board held a board meeting on October 13, 1970. The Board concluded that the "present traditions are not dehumanizing nor discriminatory with regard to race, color or creed," and that the "existing traditions now in force in all schools of this system will continue." Pltf. Exh. 178. During the next two years, blacks attempted, but were unable to obtain a hearing in that State court on their motion to dissolve the *ex parte* order. Stip. 38. The refusal by the State court to afford these blacks a hearing who were affected by the *ex parte* restraining order led to another litigation in this Federal Court in *McCain v. Abel,* Civ. No. 70–1057 (D.S.C. 1971). *See* Pltf. Exh. 17.

In an order entered on March 5, 1971, the Court directed the Department of Health, Education and Welfare to investigate the allegations of racial discrimination at the Edgefield County School district. Drawing from the interviews with T. McCain, members of the School Board, and teachers from Strom Thurmond High, the report succinctly concluded the following:

> "There is no doubt that 'Dixie' has been played this school year nor is there any doubt at this time that it will be played

next school year. The board in stating on October 13, 1970 that all school traditions will continue, although not mentioning specifics, meant the playing of 'Dixie,' the use of the 'Rebel' as a school nickname, and the flying of the Confederate flag if necessary.... By displaying these symbols and signs, the black students can very well feel that they are not a part of the school and that the school traditions are for one race only, the white race, therefore suggesting that this is not a unitary school and therefore the district would not have a unitary system and would not be in compliance with their desegregation plan even though these specifics were not mentioned in their plan." Pltf.Exh. 179 at 6–7.

This May 5, 1971 report by HEW, critically examining the inimical effects of the School Board's policies on desegregation, may have prompted the School Board to reconsider its earlier decision to allow the use and display of symbols that was offensive to the people in the black community. In the School Board meeting held on September 16, 1971, four of the seven-member School Board voted to prohibit the playing of the song "Dixie" at football games. Pltf.Exh. 180. The only black member of the School Board, Mark Adams who was appointed to fill a position vacated by an elected member, voted along with the majority. The dissenters were Scott, Wall, and Cook. *Id.* The last two named are still serving on the Board. Scott, Vol. II at 172–173.

Upon a remand from the Fourth Circuit Court of Appeals directing the District Court to reconsider its decision dismissing plaintiffs' suit in *McCain v. Abel, supra,* the Court found that the customs and symbols to which black citizens had objected were no longer used or displayed during the school sponsored activities. *Id.* Civ. No. 70–1057 (D.S.C. Feb. 7, 1973). The Court, however, concluded that the plaintiffs were deprived of the due process right to be heard in the State court on the injunction matter. It ordered that the State court *ex parte* order entered on October 12, 1970 be vacated. *Id.* at 5–6; Pltf.Exh. 17.

The attempt by the School Board to implement the "developmental school" concept in 1969 and 1970 suggested its recognition of the education deficiencies of black children who had attended the formerly all-black schools operated under the County's dual school system. In 1974, the HEW advised the Edgefield County School Board that it suspended its 1973–1974 Emergency School Aid grant because its evaluations of the school system demonstrated that certain classes were racially identifiable and that the School Board had submitted incorrect information of the number of new black teachers hired. Stip. 42. The School Board resubmitted an application for ESAA funds for the 1974–1975 school year. Attached to this application were test score statistics compiled from "Form Q of the California Comprehensive Tests of Basic Skills" taken by students from W.E. Parker Elementary, Douglas Elementary, and Merriwether Elementary schools. There were stark contrasts between black and white students in their reading and mathematical skills. Using the national norm of the 25 percentile as the ranking basis for comparison, the following figures demonstrated that there were substantially more black students who performed below this benchmark than the white students from the same school. *See* Pltf.Exh. 182.

| | Reading | | Mathematics | |
|---|---|---|---|---|
| | Black / | White | Black / | White |
| W. E. Parker | 44% | 7% | 44.5% | 6% |
| Douglas | 81% | 1% | 81.0% | 0.5% |
| Merriwether | 52% | 5% | 55.0% | 5.5% |

All public schools are required to participate in the South Carolina Basic Skills Assessment Program ("BSAP") since 1978. To implement BSAP, the State Board of Education administers testing programs on basic skills on reading, writing and mathematics for students 1st through 3rd, 6th, 8th and 11th grades to determine the readiness of each student be promoted to the next higher grade. Wooten, Vol. VI at 4; *see generally* Pltf.Exh. 358. The testing results also provide an informative basis for designing appropriate instructions for

those students who do not meet the minimum standards that are set by the State Board. In 1979, the State Board adopted the Cognitive Skills Assessment Battery ("CSAB") as the readiness test to be given to all entering public schools by the first grade. The State Board has also administered the Comprehensive Tests of Basic Skills, Form U, ("CTBS"), in the 4th, 5th, 7th, 9th, and 10th grades to obtain a basis for comparing the students' scholastic performance with the average norm of a nationally representative sample of students. Finch, Vol. VII at 184; Wooten, Vol. VI at 55.

A student is classified as "ready" to enter first grade if that student scores a minimum of 88 of a possible 117 points on CSAB. Pltf. Exh. 358 at 6. The state-wide statistics compiled from the number and percent of black and white students who were tested by CSAB and classified as ready for promotion to the first grade showed the following: *Id.* at 8.

| | White | | Black | |
|---|---|---|---|---|
| | # (%) tested | # (%) ready | # (%) tested | # (%) ready |
| 1979 | 26,983 (55.6) | 19,492 (72.2) | 21,049 (43.4) | 9,398 (44.7) |
| 1980 | 26,456 (55.5) | 19,787 (74.8) | 20,809 (43.6) | 10,310 (49.6) |
| 1981 | 25,692 (54.8) | 20,309 (79.1) | 20,787 (44.3) | 11,345 (54.0) |
| 1982 | 25,828 (54.5) | 20,961 (81.2) | 20,936 (44.3) | 12,142 (58.0) |
| 1983 | 27,328 (54.2) | 22,597 (82.7) | 22,571 (44.8) | 13,621 (60.4) |
| 1984 | 26,952 (53.1) | 22,245 (82.5) | 23,280 (45.9) | 14,166 (60.9) |

From these statistics, a consistent pattern of disparate scholastic performance between white and black children during their formative years of education has emerged. While neither one of the parties has supplied the Court with a comparable set of statistics on the racial composition of the children who took the CASB during the same years, we have no reason to question the disparities reflected by the State-wide statistics would not be representative of those from the Edgefield County. Even though the defendants have attempted to show that approximately 10% more students at the majority-black Douglas Elementary School were ready for first grade than those at the majority-white Merriwether Elementary School during 1981 to 1985, Deft.Exh. 37; Wooten, Vol. V at 182–183, the indisputable fact remains that the county-wide test results in 1985 show that 55% of black children, lagging behind in a substantial margin of 85% of their white schoolmates, who were academically eligible to enter the first grade. Pltf.Exh. 359; Finch, Vol. VII at 183.

Under the BSAP, the results of students' performance on reading, mathematics, and writing tests gathered from each school district are compared to a preset State standard in assisting to pinpoint the areas of deficiency in which appropriate compensatory and remedial instructional programs should be implemented by a school district. Wooten, Vol. VI at 36–37; *see* Pltf.Exh. 358 at 1–2. By comparison, the 1985 Edgefield district BSAP report showed that, on a percentage basis, more white students were above the State preset standard than black students in each of the subjects and in every grade tested. Pltf.Exh. 360.

Grades Tested
White (W) Black (B)
(% above the State Preset Standard)

| | 1 | | 2 | | 3 | | 6 | | 8 | | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W | B | W | B | W | B | W | B | W | B | W | B |
| Math | 82.0 | 77.0 | 96.4 | 82.1 | 79.2 | 69.8 | 72.0 | 52.1 | 75.0 | 48.8 | 94.0 | 71.1 |
| Reading | 85.4 | 75.3 | 92.8 | 75.4 | 90.9 | 80.4 | 75.7 | 59.3 | 75.2 | 52.9 | 95.5 | 58.9 |
| Writing | | | | | | | 89.8 | 70.7 | 88.2 | 68.0 | 95.5 | 71.3 |

The telltale results on the 1985 Edgefield district CTBS report also demonstrated that, on a percentage basis, more white students were above the national 50 percentile than black students in each of the subjects—reading language, and mathematics, and in every grade tested. Pltf. Exh. 361.

| | Grades Tested White (W) Black (B) (% above the national 50 percentile) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 4 | | 5 | | 7 | | 9 | 10 | |
| | W | B | W | B | W | B | | W | B |
| Reading | 65.6 | 23.0 | 49.1 | 12.9 | 54.8 | 20.4 | No Statistics Supplied | 66.3 | 16.7 |
| Language | 69.9 | 35.5 | 53.1 | 27.4 | 60.6 | 36.4 | | 71.4 | 28.6 |
| Math | 66.7 | 42.1 | 58.4 | 36.9 | 69.2 | 45.1 | | 72.8 | 29.3 |
| Total Battery | 66.7 | 30.9 | 50.4 | 17.7 | 60.6 | 29.0 | | 70.3 | 23.6 |

While the evidence shows that under the able guidance of the new school superintendent there has been an overall improvement in the quality and effectiveness of the educational system of the Edgefield County School District, *see e.g.*, Deft.Exhs. 36, 37, 38 (pt. 1-3), 39, the most recent State-mandated test results preclude a consideration that the past effects of the dual school system on black children have been all but eliminated. The majority of the student body, 67.1% of whom enrolled in the School District, were black. Wooten, Vol. V at 188. Not only those black children in the secondary grades (junior and senior high schools) performed in each area of academic subjects at a level below the white students, but also the younger ones in the primary grades (kindergarten and elementary schools) who have attended the unitary schools years since desegregation was implemented demonstrated that their scholastic aptitude did not measure up to that parity scored by white students. It may be in the future that race would no longer be used as a factor to evaluate the students' scholastic performances in Edgefield County—and we certainly applaud the continuing commendable efforts by the current school superintendent to steer the School District in the direction of educational advance and progress for all in the community—but the evidence remains clear that the educational deficiencies demonstrated in the black community play an important role in affecting their ability to participate in the County electoral process on an equal footing under certain circumstances.

D. *Socio-Economic Disparities Between the Races*

Generally speaking, there are more blacks than whites in the southern region of the United States who occupy the lower strata of various socio-economic classifications. Each of the partisan expert witnesses has presented similar statistical data culled from various census reports to support his opinion as to the significance of the socio-economic disparities between black and white citizens which may be a factor to determine their ability to fully participate in the political system challenged here.

| Total Population Edgefield County 17,528 (1980) | Whites | Blacks |
|---|---|---|
| | 8,753 (49.9%) | 8,725 (49.8%) |
| 1. Income (Pltf. Exh. 9; Deft. Exh. 20) | | |
| Families | 2,481 | 1,909 |
| Median | $16,972 | $12,293 |
| Mean | $19,737 | $13,838 |
| Households | 3,098 | 2,337 |
| Median | $13,984 | $10,566 |
| Mean | $17,138 | $12,213 |
| Per Capita Income | $ 6,178 | $ 3,294 |
| Households With Public Assistance Income | 276 | 501 |

| Total Population Edgefield County 17,528 (1980) | Whites | Blacks |
|---|---|---|
| | 8,753 | 8,725 |
| | (49.9%) | (49.8%) |

| | Whites | Blacks |
|---|---|---|
| 2. Poverty Status (Pltf. Exh. 10; Deft. Exh. 23) | | |
| Families | 2,481 | 1,909 |
| Had Income Below Poverty Line | 380 | 513 |
| Persons | | |
| Had Income Below Poverty Line | 1,814 | 2,701 |
| 3. Educational Attainment | | |
| a. Persons 25 Years Old and Over | (Pltf. Exh. 7) 5,564 | 4,126 |
| High School Graduates | 2,715 (48.8%) | 1,267 (30.7%) |
| Four or More Years of College | 774 (13.0%) | 161 (3.9%) |
| b. Persons Between 18–24 Years Old | (Deft. Exh. 22) | |
| High School Graduates | 68.5% | 60.7% |
| College Graduates | 8.2% | 1.2% |
| 4. Employment (Pltf. Exh. 8; Deft. Exh. 24) | | |
| a. Persons 16 Years Old and Over (Civilian Labor Force) | 3,944 | 3,526 |
| Unemployment | 140 | 293 |
| Persons 16 Years Old and Over (Total Labor Force) | 4,243 | 3,804 |
| Unemployed | 445 | 810 |
| Unemployed 15 Weeks or More | 163 | 444 |

---

Plaintiffs' expert witness has also sponsored statistical data on various aspects and characteristics of housings. Defendants object to their admissions into the evidence on the basis of relevancy. These data are indicative of the socio-economic conditions and should be considered, together with the other relevant evidence, under the "totality of the circumstances" standard in a Section 2 case.

5. Housing

| a. Pltf. Exhs. 2, 3 Housing Units With a: | White Householder | Black Householder |
|---|---|---|
| | 3,173 | 2,348 |
| Owners Occupied | 2,653 | 1,418 |
| Median Value | $37,400 | $20,800 |

| b. Pltf. Exh. 5 | 3,161 White Occupied Units | 2,348 Black Occupied Units |
|---|---|---|
| 1. No Telephone | 299 | 636 |
| 2. No Bathroom or Only a Half Bath | 28 | 477 |
| 3. No Complete Kitchen | 29 | 397 |
| 4. No Vehicle Available | 246 | 553 |

---

Defendants do not substantially dispute that there are socio-economic disparities which have existed in the white and black community. Indeed, implicitly emphasized in the defendants' view that the inequality gaps on income, education, employment level and living conditions are narrowing at a faster rate in Edgefield

County as they are compared to those of the State and of the National is their recognition that these circumstances of disproportionality still prevail. *See* Stanley, Vol. VI at 164–165. The Court has reviewed all of the socio-economic indicators, including those that are repeated here to demonstrate their evidentiary significance, as presented in the exhibits sponsored by both of the partisan expert witnesses. We find from all of the socio-economic conditions reported in these exhibits that the socio-economic status of black citizens as a group is lower than that of white citizens as a group in Edgefield County.

## V. EDGEFIELD COUNTY SCHOOL BOARD: ITS PAST AND PRESENT

### A. *The Appointive System Used Before 1968*

The concept of "one person, one vote" in *Gray v. Sanders,* 372 U.S. 368, 381, 83 S.Ct. 801, 809, 9 L.Ed.2d 821, 831 (1963), provided as the cornerstone for the Supreme Court to build upon it in *Reynolds v. Sims,* 377 U.S. 533, 577–78, 84 S.Ct. 1362, 1389–90, 12 L.Ed.2d 506, 535–37 (1964), the "equal population" principle for state legislative reapportionment, which led to some major changes in the political landscape in the South as well as the rest of the United States. The passage of the Voting Rights Act of 1965 removed many obstacles which had inhibited black citizens in their political participations. Prior to 1966, the South Carolina members of the State Senate and the House of Representatives were elected at-large by the voters of Edgefield County. In that year, this Federal Court in *O'Shields v. McNair,* 254 F.Supp. 708 (D.S.C.1966) (Three-judge Court), following the *Reynolds* decision, required the reapportionment of the State Senate. Under the reapportionment plan, it became apparent at that time that the population size of Edgefield County would be too small to elect a senator and that the County would be represented by a non-resident senator upon its merger with the neighboring counties. Reel, Vol. V at 136; Pltf. Exhs. 265, 266. Indeed, as a result of the 1966 senate reapportionment, Edgefield was combined with Abbeville and McCormick Counties. McCrary, Vol. IV at 44; Pltf. Exh. 267. In 1968, it was combined with Aiken, Saluda, and Lexington Counties. Pltf. Exh. 330. Since the 1966 senate reapportionment, Edgefield County has not had a resident senator. Reel, Vol. V at 139.

Prior to 1968, the Governor of South Carolina appointed the members of the Edgefield County School Board upon the recommendation of the County's legislative delegation. Reel, Vol. V at 141. With the increases in the exercise of the voting franchise by black citizens, there were some local concerns following the 1966 senatorial reapportionment that under the appointive system the various County's governing bodies, including the School Board, would be filled by nominees recommended by legislative delegations from neighboring counties. There were proposals by local politicians to adopt an electoral format which would insure that the local politics would not be dominated by the Governor's appointees nominated by an absentee senator. *Id.* at 136; McCrary, Vol. IV at 43–45; Pltf. Exhs. 266, 269, 271, 272.

### B. *County Adopted the At-Large Election System*

The South Carolina Act No. 1104, June 1, 1966, replaced the appointive system and created a new form of County Council government for Edgefield County. It provided that the legislative and administrative bodies of the County Council were chaired by a three-member board. Each of whom was elected from the County at-large from each of the three residency districts as delineated in the Act. The 1966 Act was amended in 1971 to increase the number of the members of County Council to five to be elected at-large from five residency districts. The County Council at-large electoral scheme was a subject of a 1974 litigation in this Federal Court, *see McCain v. Lybrand,* 465 U.S. 236, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984). This protracted litigation was ultimately disposed of 11 years later upon the implemen-

tation of a five single-member districts election plan in place of the at-large system for County Council election. Pltf. Exhs. 39, 38 (District Court Order approving the single member district election plan, July 11, 1985, D.S.C.)

Upon the request from the members of the Edgefield County School Board, the State Department of Education recommended in a report entitled "Report of the Committee to Recommend an Administrative Structure for the School District of Edgefield County" that the school district should be administered by a seven-member board elected at-large by popular vote to a six-year staggered term. Deft. Exh. 47 at 4. The School Board referred that Report to the County Council and invited it to request the state representative to consider drawing up a piece of legislation for organizing the School Board on the basis of the proposals. Pltf. Exhs. 331, 333. Rep. Hugh Clark, after conferring with State Senator Hester from McCormick County, introduced a bill, Act No. 1018, and the General Assembly approved it on March 28, 1968, establishing a seven-member Board of Trustees. The trustees are elected at-large by voters in the County and the terms of their office tenure are staggered for six years. There was no residency requirement under the 1968 statute. H. Clark, Vol. IV at 152–153; Pltf. Exh. 103. This Act adopting the at-large method of election for School Board Trustees was submitted to and precleared by the Department of Justice under Section 5 of the Voting Rights Act. Stip. 50.

### C. *Amendments to the School Board at-Large Statute*

Under the appointive system, the School Board members appointed by the Governor were required to reside in the vicinity of designated towns and unincorporated areas. The 1968 at-large statute for School Board election did not have a similar provision for residency requirement. In 1969, the General Assembly amended the 1968 Act by reinstating the residency requirement. It is defined by means of amalgamating various voting precincts into five geographical districts, from which the resident School Board trustees are elected. Pltf. Exh. 104.

Prior to 1974, mid-term vacancies on the School Board were filled by the State Governor's appointees to serve for the unexpired length of the elected term. Mark Adams, a black, and Everett Noel, who is still serving as one of the trustees, were appointees to the School Board in 1970 to fill the vacancies created by their elected predecessors. Derrick, Vol. VI at 16. In 1974, the State Legislature modified this appointive system by providing that a vacant seat on the board be filled by gubernatorial appointment to serve for the unexpired term, or until the next regularly held County election, whichever comes first. *Id.* at 15; Pltf. Exh. 105.

The 1968 at-large statute provided that special elections for School Board Trustees be held on the second Tuesday in April in every even year (except the first election to be held in 1969). Pltf. Exh. 103 (S.C.Code of Laws, Sec. 21–2252). Because of the generally low voter turnout for the April special election for School Board members, the Board in 1974 recommended that its elections be held at the same time as the general elections would be scheduled. Noel, Vol. V at 2–3. This recommendation was adopted by the General Assembly on February 13, 1976. Pltf. Exh. 106.

## VI. SCHOOL BOARD ELECTIONS UNDER THE AT-LARGE SYSTEM

### A. *An Overview of the Elections Between 1969 and 1984*

Since the adoption of the at-large method of elections for the School Board in 1968, nine elections were held between 1969 and 1984 to fill 24 seats on the School Board. There were 11 elections in which a seat was filled after an electoral contest. The remaining 13 seats were filled by an incumbent in an uncontested election. Eleven black candidates ran for the School Board 10 times, two of whom were incumbent Board Members. Each was initially ap-

pointed to fill a vacancy for an unexpired term; and later, each ran for the Board two times. Only once did the incumbent black candidates face a black opponent. In the other three re-election campaigns, they were unopposed. Only one black has served on the Board at any given time. Stip. 10. White incumbents sought re-election 13 times, five of which were contested. The remaining eight times white incumbents ran unopposed. Stanley, Vol. VI at 202–207; Deft. Exhs. 59, 65.

B. *A Review on Each of the Contested Elections*

1. The 1969 Election.

In the first School Board election held in 1969, two black candidates, Max Cooper and Willie Nicholson, ran from the Edgefield 1 and 2 precincts against their white opponents, R. Bryan and J. Cooper. A third seat from Johnston 1 and 2 precincts was sought by an unopposed white candidate, Cecil Yonce. The South Carolina full-slate law was in effect. Stip. 28. Voters from the entire County had to cast a vote for three of the five candidates. Pltf. Exh. 64. Neither one of the black candidates received a majority vote either from the majority white or majority black precincts. *d.*; Stanley, Vol. VII at 26.

2. The 1970 Election.

The School Board election was held in a tumultuous year as the community was rife with dissension over various racial issues. On the one hand, school desegregation plans—resisted by the whites and criticized by the blacks—were being implemented with difficulty. On the other hand, blacks began to assert their political influence on a cohesive basis under the sponsorship of the newly-founded CAFC. Stanley, Vol. VII at 27. There were four candidates on the ballot for School Board. Two of whom, Virgil Wall and Ralph Scott, were white. They ran against two blacks, James Lanham and Edward Senior. More than 50% of the registered voters voted in this April special election. Deft. Exh. 8. Each of the white candidates received 100% of the votes from white voters while the black candidates received a majority of the black votes. Deft. Exh. 60. Lanham and Senior captured three of the 17 precincts by receiving more popular votes than those of Wall and Scott combined. Pltf. Exh. 67. In the final tabulation, Scott defeated Lanham by 794 votes and Wall won over Senior by a margin of 960 votes. *Id.*

3. The 1972 Election.

Cecil Yonce, who was elected to the School Board in 1969 without an opponent, resigned in 1970. This seat was filled by an appointment of a black, Mark Adams. In the 1972 School Board election, there were six candidates, three of whom were incumbents, who were vying for three seats on the Board. Mark Adams who ran unopposed was re-elected. Abel, an incumbent, was unseated by a white challenger Avery Bland, Jr. Jethro McCain, a black contender, ran against a white incumbent Raymond Cook. Among the 17 precincts in Edgefield County, McCain carried two precincts and was evenly matched in one by popular votes. McCain received 100% of the black votes and a negligible percentage of white votes. Cook captured 94% of the white votes (and no black votes), defeating McCain by 545 votes. Pltf. Exh. 70; Deft. Exh. 60.

4. The 1974 Election.

This was the first election in which there was not a contest between a white and a black candidate for the School Board. Only one of the three incumbents was challenged. Mark Adams, again, was re-elected without facing an opponent. The voter turnout rate hit the lowest percentage mark since 1969. A little over 10% of the registered voters voted in this April election. Deft. Exh. 8; Stanley, Vol. VII at 29. The white incumbent Everett Noel commanded a solid support from the black voters. Ninety-five percent of whom voted for him while receiving only 40% of the white votes. Noel defeated his white opponent George Thompson by 545 votes. Deft. Exh. 59.

5. The 1976 Election.

J. Cooper, re-elected in an uncontested election in 1974, resigned in 1975. He was

replaced by an appointment of Sam Crouch, a white, to serve the unexpired term. Crouch, Vol. II at 174–175. All five candidates, three of whom were incumbents, were white in this election. Crouch, whose candidacy was challenged by Moody, ran for re-election. A majority of black voters (58%) supported Moody. But Crouch had 70% of the white votes and won by 785 votes. Incumbents Scott and Wall regained their seats without a contest. Deft. Exhs. 59, 60.

6. The 1978 Election.

Mark Adams resigned his School Board membership in 1977, and his seat was filled by an appointment of a black, Willie Lewis. Lewis served out Adams' term in 1978 and ran for re-election upon its expiration. Lewis captured his seat without an opponent. Lewis, Vol. V at 57.

Two of the other four candidates who ran for two seats on the Board in this election were old political foes. Jethro McCain, a black, again ran against the white incumbent Raymond Cook, McCain's 1972 opponent. The other two opposing candidates were Ben. Clark and Danny Barfield. Both of whom were white. In the contest between McCain and Cook, the election results tabulated that all but three precincts had more whites than blacks who voted in the June Democratic primary. Pltf. Exh. 86. In two of the three precincts, Trenton, Brunson and North Side where more blacks than whites voted, McCain had a fairly large margin of votes over Cook. *Id.* In North Side, Cook captured it by merely one vote. *Id.* McCain received 92% of the black votes and, conversely, Cook had 91% of the white votes. Deft. Exh. 59. Because there were more whites (2,465) than blacks (1,087) who cast their ballots in this election, Pltf. Exh. 87, Cook won over McCain by 956 votes. Deft. Exh. 59.

In the contest between the two white candidates, Clark, who had shared the principalship with a black at Strom Thurmond High School, received overwhelming electoral support from the white and black voters and won over Barfield, whose candidacy was endorsed by some of the School Board members. Noel, Vol. IV at 201–202. Clark received a majority of votes from the black and white voters (93% black, 54% white). Deft. Exh. 60. Clark won by 1,564 popular votes—the largest winning margin in a School Board election. Deft. Exh. 59.

7. The 1980 Election.

This was the last contested School Board election and the first one in which the black incumbent was challenged by an opponent —and, in this election by a black contender. The incumbent white member, Everett Noel, was re-elected without any opposition. Incumbent Willie Lewis was up for re-election in this election. His opponent was a black, Mosley. While Mosley received 52% of the white voter's votes, they were not enough to overcome the overwhelming backing from the black voters—86% of whom voted for Lewis. Deft. Exh. 60. Lewis won by 1,299 votes. Deft. Exh. 59.

In each of the elections held since 1980, none of the members who ran for another term on the Board faced a challenger. We understand that Lewis had filed for re-election at the time this matter was tried in April 1986, and that he was re-elected for another term without a contest. The following table summarizes the percentage of votes by race each candidate received in each of the contested School Board elections. *See* Deft. Exh. 60.

| | (*) Winner<br>(W) White<br>(B) Black | % of White Voted | % of Black Voted |
|---|---|---|---|
| 1969 | | | |
| | Bryan (W)* | 88% | 62% |
| | J. Cooper (W)* | 100% | 70% |
| | Nicholson (B) | 8% | 41% |
| | M. Cooper (B) | 4% | 7% |
| 1970 | | | |
| | Scott (W)* | 100% | 8% |
| | Wall (W)* | 100% | 16% |
| | Lanham (B) | 0% | 92% |
| | Senior (B) | 0% | 84% |
| 1972 | | | |
| | Bland (W)* | 89% | 35% |
| | Abel (W) | 7% | 48% |
| | Johnson (W) | 3% | 17% |
| | Cook (W)* | 94% | 0% |
| | McCain (B) | 6% | 100% |
| 1974 | | | |
| | Noel (W)* | 95% | 40% |
| | Thompson (W) | 5% | 60% |

| (*) Winner (W) White (B) Black | % of White Voted | % of Black Voted |
|---|---|---|
| 1976 | | |
| Crouch (W)* | 70% | 42% |
| Moody (W) | 30% | 58% |
| 1978 | | |
| Cook (W)* | 91% | 8% |
| McCain (B) | 9% | 92% |
| Clark (W)* | 54% | 93% |
| Barfield (W) | 46% | 6% |
| 1980 | | |
| Lewis (B)* | 48% | 86% |
| Mosley (B) | 52% | 14% |

It becomes readily apparent from this empirical data that in all but one contested election (1980) a candidate who received a majority percentage of white votes won the election. Only two candidates (Clark 1978 and Lewis 1980) who captured substantially more black votes than their opponents received the mandate to serve on the School Board. The voting patterns demonstrate that race played a role in each of the School Board elections. The fact that each racial group consistently voted in bloc for different candidates suggests that there is a correlation between the race of the voters and the selection of certain candidates. This phenomenon signals the existence of racial bloc voting in Edgefield County.

Racial bloc voting (or racially polarized voting) is a political reality in almost all political races in our Nation that is composed of polychromatic constituencies. The importance of racial bloc voting, however, should not be underestimated. Its potential adverse effect in this form of government could balefully engender irresponsible governance, because, in the case of white bloc voting, it allows "those elected to ignore black interests without fear of political consequences." *Rogers v. Lodge,* 458 U.S. 613, 623, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012, 1022 (1982). Thus, on the one hand, if the significance of racial bloc voting has only a minimal effect on the outcome of an election, its mere existence in a democratic electoral process does not necessarily render the electoral structure in which it occurs unconstitutional. *Cf. United Jewish Organizations v. Carey,* 430 U.S. 144, 165–167 n. 24, 97 S.Ct. 996, 1009–1010 n. 24, 51 L.Ed.2d 229, 245–247 n. 24 (1977) (bloc voting, by itself, does not unconstitutionally dilute the voting strength of a protected group). On the other hand, "without bloc voting the minority candidates would not lose elections solely because of their race." *Rogers v. Lodge, id.* In a vote dilution case, the parties usually proffer statistical and anecdotal evidence to demonstrate the extent of bloc voting along racial lines. *See* Sen.Rep. No. 97–417, 97th Cong., 2d Sess. 28–29 (hereinafter cited as Sen.Rep.), *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 206–207 (hereinafter cited as 1982 USCAN).

## VII. RACIALLY POLARIZED VOTING IN A VOTE DILUTION CLAIM

### A. *Legal Standard*

The Supreme Court recently decided a vote dilution case under Section 2 of the Voting Rights Act as amended in 1982. Noting its agreement with the lower courts that "racial bloc voting is a key element of a vote dilution claim," the Court in *Thornburg v. Gingles,* — U.S. —, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), explained that there are two reasons for inquiring into the existence of racial bloc voting. This inquiry is required "to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* at —, 106 S.Ct. at 2769. To determine whether or not the degree of racial bloc voting in a given geopolitical unit is "legally significant," the Court required an examination of the voters' practices under these circumstances.

> "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, ..., and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'cross-over' votes rises to the level of white bloc voting."

*Id.* (citations omitted). The Court listed a number of illustrative factors which may vary the determination of the degree of white bloc voting, and, consequently, its impact upon the black voters' ability to elect representatives of their choice. These guiding factors for the courts to consider are: "the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority groups; the size of the district[.]" *Id.* & n. 24. The Court further instructed that a conclusion drawn from "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Id.* For the same reason, the Court reminded the lower courts that they should not hastily discount the legal significance of racial bloc voting in a district where elections are shown traditionally polarized upon a finding that racial bloc voting was not present or that minority candidates were successful in one or a few individual elections. *Id.* at ——, 106 S.Ct. at 2769–2770.

### B. *Methodology, Quantitative and Anecdotal Evidence*

In *Thornburg,* the Supreme Court adopted the definition of racial bloc or racially polarized voting offered by the plaintiffs' expert witness to mean that " 'racial polarization' exists where there is 'a consistent relationship between [the] race of the voter and the way in which the voter votes,' ..., or to put it differently, where 'black voters and white voters vote differently.' " *Id.* at —— n. 21, 106 S.Ct. at 2767 n. 21. To determine the magnitude of the differences in voting behavior that correlates to each of the voting racial groups, there are two analytical methodologies—extreme case analysis and bivariate ecological regression analysis—that are commonly relied upon by expert witnesses in vote dilution cases. Both of these analytic techniques that "yield data concerning the voting patterns of the two races, including estimates of the percentages of members of each race who voted for black candidates," have been accepted by the lower courts and approved by the Supreme Court in *Thornburg, id.* In doing so, the *Thornburg* Court specifically rejected the appellants' contention that the racial bloc voting issue should be resolved by the multiple regression analysis.[1] *Id.* at —— & n. 32, 106 S.Ct. at 2772 & n. 32.

The Supreme Court in *Thornburg* accepted the district court's characterization that both methods—extreme case analysis and bivariate ecological regression analysis—are "standard in the literature for the analysis of racially polarized voting." —— U.S. at ——, n. 20, 106 S.Ct. at 2767, n. 20,

1. The defendants have made a similar argument during the trial of and in their post-trial briefs on this matter. They criticized the validity of the statistical studies by the plaintiffs' expert witness, who focuses his inquiries of racial bloc voting on the racial relationship of the voters and the candidates. Defendants' expert witness, following Judge Higginbotham's concurring opinion on the efficacy of multivariate regression analysis in *Jones v. City of Lubbock,* 730 F.2d 233, 234 (5th Cir.1984), presented testimonial evidence which includes factors such as ideological differences between candidates and incumbency advantages that might have caused the racially differential patterns of voting. *See* Stanley, Vol. VII at 14–20, 41–44. We note the Fourth Circuit Court of Appeals affirmed the district court's decision in *Collins v. City of Norfolk,* 768 F.2d 572 (4th Cir.1985), *aff'd,* 605 F.Supp. 377, 387 (E.D.Va.1984), in which the district court also considered, in addition to the race factor, evidence on incumbency, endorsements and name recognition that could influence voting behavior. Before the Supreme Court handed down the *Thornburg v. Gingles* decision, it issued an Order vacating the judgment of affirmance of the Fourth Circuit Court in the *Collins* case, *supra. See Collins v. City of Norfolk,* — U.S. ——, 106 S.Ct. 3326, 92 L.Ed.2d 733, (1986). We believe that the *Thornburg* Court has decided that multivariate regression analysis was not required in a § 2 vote dilution case under the definition of racial bloc voting which the Supreme Court has adopted, for "the addition of irrelevant variables distorts the equation and yields results that are indisputably incorrect under § 2 and the Senate Report." — U.S. at ——, 106 S.Ct. at 2772.

*Gingles v. Edmisten,* 590 F.Supp. 345, 367–368 nn. 28, 32 (E.D.N.C.1984). The extreme case analysis, also known in the social science literature as "homogeneous precinct analysis," examines

> "two groups of 'homogeneous' precincts: those in which almost all potential voters are black and those in which proportionately few are black. Precincts are considered to be homogeneous if over 90 percent of the population, voting age population, or registered voters (depending on which data are available) residing in the precinct are members of the minority group; or conversely, less than 10 percent are members of the minority group. After identifying these precincts, the analyst compares the level of participation and the votes cast for different candidates within each group of precincts. The figures derived from these homogeneous voting units serve as estimates of the behavior of all respective group members in that political jurisdiction."

*See* Engstrom & McDonald, Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting, 17 Urban Lawyer 369, 371 (Summer 1985) (hereinafter cited as Engstrom & McDonald) (cited in *Thornburg v. Gingles,* — U.S. at —— n. 20, 106 S.Ct. at 2767 n. 20); *see also* O. Burton, Vol. III at 138–139.

The other "complementary" method for analyzing the extent of racial bloc voting is the correlation and regression analysis. Conducted in a bivariate format, this analysis generates "statistical coefficients" that measure the "consistency and strength of the relationship between two variables." Engstrom & McDonald, *supra,* at 375. The independent variables represent "a summary measure of the race of the voters in each precinct (usually the percentage of blacks among the total population, voting age population, or registered voters)." *Id.* at 374. The dependent variable is the percentage of vote each candidate received from each of the racial groups that voted in each precinct. *Id.* The points that represent the individual variables gathered from each of the precincts are plotted on a right-angled Cartesian coordinate graph. The correlation coefficient, expressed as "r", demonstrates "how consistently the electoral support for a candidate or group of candidates varies with the race of the voters in the precincts." *Id.* at 375. The range of the correlation coefficient factors is ranged from − 1.0 through 0 to + 1.0. R factors of − 1.0 and + 1.0 indicate a perfect correlation between two variables. In other words, a R factor of − 1.0 or + 1.0 will enable one to predict on a statistical basis the value of one variable if the value of the other variable is known. O. Burton, Vol. III at 146. R factors of ± 0.5 are generally considered by social scientists statistically significant. *Id.* at 147; *see also* Grofman, Migalski & Noviello, The "Totality of Circumstances Test" in Section 2 of the 1982 Extension of the Voting Rights Act: A Social Science Perspective, 7 Law & Policy 199, 206 (April 1985) (hereinafter cited as Grofman, Migalski & Noviello) (cited in *Thornburg v. Gingles,* —— U.S. at —— n. 20, 106 S.Ct. at 2767 n. 20).

The other coefficient, regression coefficient, provides "an estimate of *how strongly* two variables are related; that is, to what extent the scores for a dependent variable can be expected to change in response to changes in the scores for an independent variable." Engstrom & McDonald, *supra* at 375 (emphasis original). By plotting a straight line that "best" fits the various points on the Cartesian coordinate graph, "the slope of the regression line provides an estimate of the strength of the relationship between two variables; the greater the slope, the stronger the relationship." [2] *Id.* at 376; *see also* O. Burton, Vol. III at 146; Stanley, Vol. VI at 199. Stating it in plain language, the coefficient data engendered from the regression analysis will enable one to determine the percentages of white and black voters who

2. For a more detailed technical discussion on regression coefficient, reader is referred to the article by Grofman, Migalski & Noviello, *supra.*

voted for the same candidate. Stanley, Vol. VII at 119–120.

Plaintiffs introduced expert testimony of Dr. O. Burton who, based upon the correlation and regression analysis he conducted, is of the opinion that voting along racial lines occurred in those elections in Edgefield County involving candidates of different races. While Dr. Burton did not fully explore the bloc voting issue under the extreme case analysis, he has sponsored exhibits on School Board election returns which demonstrate that candidates of one race consistently received insignificant electoral support in those precincts in which their race is in the minority. In those precincts where 90% of the registered voters were white, the numbers and percentages of the voters in the 1969, 1970, 1972 and 1978 School Board elections show the following: *See* Pltf.Exhs. 64, 67, 86, 87.

| | Precincts | % of White Registered Voters | % of White Voted for Black Candidates | # of White Voted for Black Candidates |
|---|---|---|---|---|
| 1969 | Central | 94% | 8% (for both M. Cooper & Nicholson) | 3 (for both M. Cooper & Nicholson) |
| | Cleveland | 90% | 8% | 7 |
| | Long Branch | 90% | 3% | 2 |
| | Red Hill | 100% | 3% | 9 |
| 1970 | Colliers | 92% | 3% (for both Lanham & Senior) | 2 (for both Lanham & Senior) |
| | Long Branch | 90% | 28% | 10 |
| | Red Hill | 99% | 0 | 0 |
| 1972 | Cleveland | 90% | 10% (J. McCain) | 3 (J. McCain) |
| | Colliers | 92% | 3% | 1 |
| | Red Hill | 98% | 2% | 1 |
| 1978 | West Side | 100% | 6% (J. McCain) | 12 (J. McCain) |

The only Edgefield County election which was tested by Dr. Burton under the extreme case analysis is the 1982 primary election for County Council. In those predominantly black majority precincts, black candidates received the majority percentages of the votes from voters of their race. *See* Pltf.Exh. 195A(195B); O. Burton, Vol. III at 138–141; Deft.Exh. 173.

As we have noted, Dr. Burton focuses his inquiries on the extent of racial bloc voting in Edgefield County elections upon the results generated from using the correlation and regression technique. By examining those elections in which black and white were contesting candidates, O. Burton, Vol. III at 136, Dr. Burton has constructed the following data which supports his view that there is a high correlation between the votes received by the candidates and the racial composition of the voters. In a nutshell, the study reveals that in 4 of 11 contested School Board elections in which candidates were of a different race, the outcome of each could be statistically predicted and reasonably explained by the race of the voters. In the other elections in Edgefield County which involved black and white candidates, tests conducted under the same methodology also yield similar conclusions on racial bloc voting practices. The data which appears in the chart below are condensed from Dr. Burton's computer printouts, which were admitted into evidence as Pltf.Exh. 195.

| Election | Correlation Coefficient (R) | R Squared[3] | Regression Coefficient: % of Voters Voted for White Candidates — White | Black |
|---|---|---|---|---|
| 1969 School Board | 0.719 | 0.516 | 95% | 51% |
| 1970 School Board | 0.926 | 0.858 | 100% | 0% |
| 1972 School Board | 0.868 | 0.753 | 100% | 51% |
| 1978 School Board | 0.978 | 0.957 | 91% | 10% |
| 1974 County Council (District 2) | 0.957 | 0.916 | 91% | 14% |
| 1976 County Council | | | | |
| (District 2) | 0.993 | 0.986 | 100% | 0% |
| (District 3) | 0.989 | 0.977 | 100% | 0% |
| (District 5) | 0.976 | 0.953 | 99% | 2% |
| (Run-off in District 3) | 0.977 | 0.955 | 97% | 0% |
| (Run-off in District 5) | 0.978 | 0.956 | 97% | 0% |
| 1982 County Council | | | | |
| (Districts 2 and 3) | 0.990 | 0.980 | 92% | 6% |
| (District 5) | 0.972 | 0.945 | 90% | 8% |
| 1984 County Council (District 1) | 0.723 | 0.522 | 97% | 0% |

*******

The fundamental dispute between the partisan expert witnesses over the issue of racially polarized voting concerns the application of the statistical results from these technical analyses to a definition on racially polarized voting offered by one expert but was not endorsed by the expert for the opposing party. There are some insubstantial differences attributable to variances in data input in the statistical results presented by each expert witness. Both, however, found that there is a general pattern in the voting behavior and that a correlation exists between the race of the voters and the differences in the selection of candidates by each racial group. Stanley, vol. VII at 116–117. Defendants' expert witness, Dr. Stanley, however, is of the view that a conclusion of racial bloc voting could not be drawn from the studies because the results do not fit into the definition for racially polarized voting which he espouses. Dr. Stanley defines racially polarized voting as "when whites consistently vote antagonistically to minority interests, with the result that minority candidates and minority backed candidates do not have a realistic chance to gain election." *Id.* Vol. VI at 211. We must reject the legal precept that underscores the defendants' theory of racially polarized voting for the reason supplied by the *Thornburg* Court. The Stanley definition, as applied to a *statutory* claim for a Section 2, is flawed because it relies on the interjection of a consideration of racial motive as a primary determinative cause for the racially divisive voting behavior. Under the definition of racially polarized voting as approved by the *Thornburg* Court, proof of white voters' racial hostility toward black candidates that is actually the cause of the voter behavior is no longer a relevant inquiry. *Thornburg v. Gingles, supra,* — U.S. at —, 106 S.Ct. at 2776. Rather, under Section 2 and under the "functional theory" of vote dilution, *id.* at —, n. 15, 106 S.Ct. at 2764 n. 15, all that matters is the "voter behavior, not its explanations." *Id.* at —, 106 S.Ct. at 2778.

3. R squared expresses the percentage of variance in the vote that is explained by the race of the voters. O. Burton, Vol. III at 149–150. For example, the R factor in the 1970 School Board election is determined to be 0.926. The square of which is 0.858—or 85% of the vote is explained by the race of the voters. *See id.* at 151.

Even more persuasive to the Court than the experts' quantitative analyses of polarization on voting behavior is the testimony by the local politicians who, through their participation in the political processes, have the direct observation and are familiar with the voting practices and voting patterns in Edgefield County. The plaintiffs' lay witnesses testified from their political experience that there has always been voting along racial lines by both white and black voters in almost all of the elections in which white candidates were challenged by black candidates, *see* T. McCain, Vol. I at 40–41; Brightharp, Vol. I at 82–87; Bright, Vol. II at 30; Burt, Vol. II at 61; Jackson, Vol. II at 85, 115; Crouch, Vol. II at 181–182; J. McCain, Vol. III at 9; Wilson, Vol. III at 48–49. Some of the defendants' lay witnesses were willing to acknowledge that the extent of racial bloc voting confirms that, at least subtly, race remains at issue in the Edgefield County political system. *See* Noel, Vol. V at 24; Lewis, Vol V at 78; B. Clark, Vol. V at 126; Reel, Vol. V at 138; Derrick, Vol. VI at 23–24. We also note, for the purpose of analyzing the racial bloc voting issue in Edgefield County, that the results in the first County Council election held in 1984 under the single-member district plan [4] were: two majority black districts elected two black representatives, two majority white districts chose two representatives of their race, and the fifth seat on the County Council was captured by a black candidate in a district where the percentages of white and black registered voters were near parity. We understand that in the 1986 primary this fifth seat was won by a white candidate. Prior to the implementation of the single-member district election plan in 1984, no blacks were ever elected to the County Council under the at-large election scheme. Stip. # 63. These two recent County Council elections confirmed the political unity of each racial group and the cohesiveness of its voting behavior.[5] We find that there is substantial and credible evidence which demonstrates that racially polarized voting exists in Edgefield County politics. The tenacious strength of white bloc voting usually is sufficient to overcome an electoral coalition of black votes and white "crossover" votes. On this factual basis, we conclude that the legal significance of racial bloc voting is such that the degree of its persistence and severity indicates that race still is a predominant influence over the electorate's preferences.

## VIII. LEGAL REQUIREMENTS FOR PROVING A VOTE DILUTION CASE

Plaintiffs brought this vote dilution suit under Section 2 of the Civil Rights Act of 1965, *as amended*,[6] and under the First,

4. We express no opinion as to the propriety of the single-member district plan as an appropriate means for a School Board election.

5. The results of these 1984 and 1986 County Council elections also validate the hypothesis observed by the Supreme Court in *Thornburg v. Gingles, supra.* In testing the geographical and political tenacity of a minority group, the Court postulated the concept that to "'demonstrate (that minority voters are injured by at-large elections), the minority voters must be sufficiently concentrated and politically cohesive that a putative districting plan would result in districts in which members of a racial minority would constitute a majority of the voters, whose clear electoral choices are in fact defeated by at-large voting.'" *Id.* — U.S. at — n. 17, 106 S.Ct. at 2767 n. 17. (insert original).

6. Section 2, *as amended*, 96 Stat. 134, 42 U.S.C. Sec. 1973 (1982) reads as follows: "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) (42 U.S.C. Sec. 1973b(f)(2) of this title), as provided in subsection (b) (of this Section). (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this Section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be con-

Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. In *Escambia County v. McMillan*, the Supreme Court instructed that in a controversy where both statutory and constitutional questions are presented, the statutory claim should be adjudicated first. 466 U.S. 48, 51, 104 S.Ct. 1577, 1578, 80 L.Ed.2d 36, 39 (1984) (per curiam). In a vote dilution case, a finding that the electoral structure under challenge is unlawful as violative of Section 2 would dispose of the necessity to pass upon the plaintiffs' constitutional claims. *Id.* We believe that the resolution of this case falls within the perimeter of these principles, which requires us to consider only the plaintiffs' statutory claims.

In amending Section 2, Congress removed the proof of discriminatory intent required by the *Mobile v. Bolden* decision, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Instead, the statute now requires a plaintiff in a vote dilution case to show only the discriminatory effect which results in a dilution of minority voting strength.[7] In determining whether or not a violation of the Voting Rights Act has been shown, the courts are required to find that the plaintiff has satisfactorily demonstrated, upon "the totality of the circumstances" that "the political processes leading to the nomination or election ... are not equally open to participation by members of a (protected class) ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. Sec. 1973(b). The lack of proportional representation does not automatically require a finding of a violation. Section (b), however, provides that the extent to which members of a protected class are elected to office is relevant in evaluating an alleged violation. *Id.* As an aid to the interpretation of the amended Act, Congress recapitulated in the legislative history of the Act a list of objective factors

sidered: *Provided,* That nothing in this Section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

7. There is language in the legislative history that the 1982 amendment to the Voting Rights Act in response to the *Bolden* decision did not change the proof of discriminatory intent—a more difficult burden of proof—that is necessary to establish a violation of plaintiffs' constitutional rights alleged under the Fourteenth and Fifteenth Amendments. 446 U.S. at 61–62, 70–74, 100 S.Ct. at 1496–1497, 1501–1503, 64 L.Ed.2d at 54–55, 60–63. *See also Rogers v. Lodge,* 458 U.S. 613, 618–620, 102 S.Ct. 3272, 3276–3277, 73 L.Ed.2d 1012, 1018–1019 (1982) (Proof of discriminatory intent required under Fourteenth Amendment; Court expressed no view on its applicability to a vote dilution claim under the Fifteenth Amendment. *Id.* at 619 n. 6, 102 S.Ct. at 3276 n. 6). The Senate Report states: "Congress cannot alter the judicial interpretations in *Bolden* of the Fourteenth and Fifteenth Amendments by simple statute. But the proposed amendment to section 2 does not seek to reverse the Court's *constitutional* interpretation. Rather, the proposal is a proper statutory exercise of Congress' enforcement power ... and it is not a redefinition of the scope of the Constitutional provision." Sen.Rep. No. 97–417, *supra,* at 41, 1982 USCAN, *supra,* at 219. (emphasis added).

While we find that it is unnecessary to decide the "intent" issue raised in the plaintiffs' constitutional claims under the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, we note that both parties presented expert testimony interpreting the history on racial considerations, or lack thereof, by the State Assembly in adopting the at-large electoral structure of the School Board election in 1968. *See generally,* McCrary, Vol. IV at 33–75; Belz, Vol. V at 31–35. *See also* McCrary, Discriminatory Intent: The Continuing Relevance of "Purpose" Evidence in Vote-Dilution Lawsuits, 28 How.L.J. 463, 488–489 (1985). We observe in a declaratory judgment suit by the County Council of Sumter County, South Carolina a three-judge court found that the plaintiffs (Sumter County County Council) "failed to carry their burden of proving that the legislature did not pass (the Act that adopted the at-large scheme for the County Council) in 1967 for a racially discriminatory purpose at the insistence of the white majority in Sumter County, because the at-large method of voting may have diluted the value of the then-increasing voting strength of the black majority, may have prevented formation of a black majority senate district, and probably prevented appointment by the Governor of blacks to the Sumter County Council." *County Council of Sumter County v. United States,* 596 F.Supp. 35, 38 (D.D.C.1984). That court also found that plaintiffs failed "to carry their burden of proving that the at-large system was not maintained after 1967 for racially discriminatory purposes and with racially discriminatory effect." *Id.*

which would serve as guides for discerning whether or not a specific electoral structure or practice has discriminatory results. These factors include the existence of racially polarized voting; past discrimination and its lingering effects; election practices that exacerbate the disparities in minority participation in political process; access to the slating process; elections pervaded by racial innuendoes and appeals; tenuousness of state policies underlying the at-large elections; success of minority candidates; and "enhancing factors" such as the existence of large districts, majority vote requirements, anti-single shot provision and the lack of provision for at-large candidates running from particular geographical subdistricts. Sen.Rep. No. 97–417, *supra,* at 28–29, 1982 USCAN, *supra,* at 206–207. Congress makes clear that these factors are neither exclusive nor controlling. The legislative history also states that "there is no requirement that any particular number of factors be proved, or that a majority of them point(s) one way or the other." *Id.* at 29, *id.* at 207. Rather, Congress, by espousing a "functional view of 'political process'" in the amended Section 2, *id.* at 30 n. 120, *id.* at 208, intends that these guiding factors should be flexibly applied "upon a searching practical evaluation of the 'past and present reality.'" *Id.* In this connection, the legislative history summarizes the views of the lawmakers that

> "The courts ordinarily have not used these factors, nor does the committee intend them to be used, as a mechanical 'point counting' device. The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution. Rather, the provision requires the court's overall judgment, based on the totality of the circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is ... 'minimized or cancelled out.'"

*Id.* at 29 n. 118, *id.*

Under this "functional view" of the political process approach, the Supreme Court in *Thornburg v. Gingles, supra,* substantially refines the inquiry for a Section 2 vote dilution claim by focusing on two "most important Senate Report factors." ––– U.S. at ––– n. 15, 106 S.Ct. at 2764 n. 15. One of which concerns the examination on "the extent to which minority group members have been elected to public office in the jurisdiction," and the other one involves the analysis on "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Id.* If a plaintiff satisfactorily demonstrates that these two factors exist, the *Thornburg* Court believes that the other factors listed in the Senate Report, *supra,* such as

> "the lingering effects of past discrimination, the use of racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multi-member districts when substantial white bloc voting exists—for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to,* a minority voter's claim."

*Id.* (emphasis original). On this basis, the *Thornburg* Court sets out the required elements for proving a vote dilution case under Section 2. The Court first states that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." Second, "the minority group must be able to show that it is politically cohesive, that is, that a significant proportion of the minority group supports the same candidates." Third, the Court requires the minority group to "demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." If these three requirements are met, the minority group has proved vote dilution in violation of Section 2. ––– U.S. at –––––, 106 S.Ct. at 2764–2767.

We have found in the discussions under Section VI *ante,* at 34, that only one of two blacks, chosen by the School Board and the State legislative delegation, ap-

pointed by the Governor initially to serve an unexpired term, and unchallenged by any white candidate in each re-election, has served at a given time on the School Board.[8] We have also found and concluded in the analysis of racially polarized voting under Section VII, *ante,* at 42, that the legal significance of racial bloc voting is such that bloc voting by white voters has the force and effect to overcome the combined strength of minority voters and white "crossover" votes in Edgefield County School Board elections. Upon the findings stated in these two Sections, we now conclude that the plaintiffs have met the three-part analysis set out in *Thornburg v. Gingles, supra,* necessary for proving a vote dilution case under Section 2 of the Voting Rights Act. Conducted under the single-member district plan, the results of the County Council elections in 1984 and 1986 have served to confirm the requirements that blacks are politically and geographically cohesive and compact enough to constitute a majority in one or more single-member districts in Edgefield County. By contrast, the evidence on County Council and School Board elections held under the at-large electoral scheme generally demonstrates, however, that candidates who received substantial support from black voters would not usually win the elections without also obtaining a significant share of ballots from the white voters.

While the basic contours of a vote dilution claim, as streamlined by the *Thornburg* Court, require a factual appraisal on two of nine illustrative factors highlighted in the Senate Report, the Court encourages the lower courts to consider those other factors that "are supportive of, but *not essential to*" such a claim. —— U.S. at —— n. 12, 106 S.Ct. at 2764 n. 12. (emphasis original). We have considered the pernicious effects of past racial discrimination that impair the present-day ability of blacks to participate effectively in the political processes and to elect representatives of their choice. We have found that the legacy of past racial discrimination has, to a certain extent, survived and become institutionalized in the areas of employment, education, and various basic living conditions in the black community in Edgefield County. These disparaging socio-economic conditions, in turn, can lead to lower voter registrations and fewer voter turnouts by blacks, and, consequently, can devalue the effectiveness of their participation and influence in the political affairs. The Supreme Court has recognized that inequalities in education, employment, income level and living conditions that arise from past racial discrimination have a deleterious tendency to hinder minority political participation. *White v. Regester,* 412 U.S. 755, 768, 93 S.Ct. 2332, 2340, 37 L.Ed.2d 314, 325 (1973). "Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." Sen.Rep. No. 97–417, *supra,* at 29 n. 114, 1982 USCAN, *supra,* at 207. This is because "inequality of access is an inference which flows from the existence of economic and educational inequalities." *Kirksey v. Board of Supervisors,* 554 F.2d 139, 145 (5th Cir.1977) (*en banc*), *cert. de-*

8. We are mindful of the statutory prohibition that Section 2 does not establish a right of proportional representation. 42 U.S.C. Sec. 1973(b). The legislative history, on the other hand, reminds us that the election of one or a small number of minority elected officials will not foreclose a finding of no vote dilution. Sen. Rep. No. 97–417, *supra,* at 29 n. 115, 1982 USCAN, *supra,* at 207. This is because such electoral successes "may be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds." *Zimmer v. KcKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973), *aff'd sub nom, East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). While we need not decide under Section 2 the plaintiffs' claim of tokenism as the reason behind the appointment of a black to the School Board, *see* S.Rep., *supra,* at 36; T. McCain, Vol. I at 59–60; Bright, Vol. II at 40–42, we note that one of the School Board members testified that the School Board "felt (it) ought to have minority representation." Crouch, Vol. II at 190.

*nied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Under the present voter registration system, *see ante,* Section IV at 6, it can be argued, as the defendants are asserting here, that if the same efforts now being used continues on a sustained basis, the disparity in voter registration between black and white citizens could be eliminated in the future. Even if this is a probable clairvoyance,[9] we do not believe that such outcome would be dispositive of the basic question that concerns the Court. The key inquiry in a Section 2 vote dilution case is, as the Supreme Court said in *White v. Regester, supra,* 412 U.S. at 770, 93 S.Ct. at 2341, "whether the political processes are 'equally opened' depends upon a searching practical evaluation of the 'past and present reality, (political or otherwise).'" Sen.Rep. No. 97–417, *supra,* at 30, 1982 USCAN, *supra,* at 208. It is therefore irrelevant for us in "applying amended Section 2 to speculate or to attempt to make findings as to whether a presently existing condition of racial vote dilution is likely in due course to be removed by normal political processes." *Gingles v. Edmisten, supra,* 590 F.Supp. at 357.

A vote dilution case may be strengthened by a showing of the existence of the "enhancing factors," [10] which include staggered terms, district residency, majority vote requirement, anti-single shot provisions, unusually large election district. *See Zimmer v. McKeithen, supra,* 485 F.2d at 1305; *see also Thornburg v. Gingles, supra,* — U.S. at —, 106 S.Ct. at 2787 (O'Connor, J., concurring). Other factors such as racial appeals and tenuousness of state policy may also be considered. *Id.* We will briefly examine those factors that are factually significant and legally applicable to this vote dilution case. *See Thornburg, supra,* at —, 106 S.Ct. at 2768, (applicability of these factors "will vary from district to district.")

As we have noted, the School Board members are elected from their individual resident districts and the terms of their office tenure are staggered. The Supreme Court has considered the advantages and disadvantages of district residency requirement in the context of a vote dilution claim. On the one hand, the existence of district residency requirement in a multimember district could, to some degree, ameliorate the disadvantage of voting minority by preventing the concentration and election of all candidates from "'lilly white' (sic) neighborhoods." *Rogers v. Lodge, supra,* 458 U.S. at 627, 102 S.Ct. at 3280. On the other hand, the Supreme Court has also recognized that the requirement of candidates to reside in a separate district functions "just like the numbered posts." *City of Rome v. United States,* 446 U.S. 156, 185 n. 21, 100 S.Ct. 1548, 1565 n. 21, 64 L.Ed.2d 119, 145, n. 21 (1980). By separating one election into a number of individual contests, the district residency requirement has been found to have the "effect of frustrating single-shot voting" by minority voters in an at-large electoral format. *City of Rome, id.*

In *City of Rome, supra,* the Supreme Court also discussed the dilutive effect of staggered terms of office on the minority voting strength in an at-large election. Staggered terms, which are used for the School Board here, are recognized as contributing to minority vote dilution in a racial bloc voting jurisdiction, because they "have the effect of forcing head-to-head contests between Negroes and Whites and

9. *Cf. Kirksey v. Board of Supervisors, supra,* 554 F.2d at 150. That court rejected the defendants' extrapolated projections similar to those made by the defendants here, noting that equal voting rights depend upon "realistic opportunity," not based upon "gossamer possibilities."

10. *Cf.* While the legislative history indicates that Congress did not articulate the distinction between the "primary" and "enhancing" factors in the amended Section 2, it seems clear that the *Thornburg* Court has treated the evidentiary value of polarized voting and minority electoral success as a matter of primary importance in a Section 2 vote dilution case. *See ante,* at 59.

depriving Negroes of the opportunity to elect a candidate by single-shot voting." 446 U.S. at 185, 100 S.Ct. at 1565, 64 L.Ed.2d at 145. Given the legal significance of racial bloc voting and the negligible degree of electoral success by minority candidates in Edgefield County School Board elections, the requirements of residency district and staggered terms are combined to weigh in favor of plaintiffs' claim of vote dilution on these criteria.

A majority vote requirement is in use in all primary elections in South Carolina, including elections for the School Board members in Edgefield County, S.C.Code Sec. 7-17-600, Pltf.Exh. 222, although not in the general elections. Stip. 28. The requirement of a majority vote in the primary elections plus the dispositive significance of the Democratic Primary in Edgefield County strengthens the plaintiffs' claim of vote dilution. The general effect of a majority vote requirement in a jurisdiction such as Edgefield County is that it "would always require the black candidate in an at-large election, if he survived the initial round, to run against one white candidate." *City of Port Arthur v. United States*, 459 U.S. 159, 167, 103 S.Ct. 530, 535, 74 L.Ed.2d 334, 342 (1982). Where there exists racial voter polarization, the majority vote requirement "would permanently foreclose a black candidate from being elected to an at-large seat." *City of Port Arthur, id.* Defendants have urged us to disregard the potential adverse effect of a majority vote requirement in the Democratic Primary, because, they claim, there has never been a runoff in the School Board elections.[11] *See* Defendants' Proposed Findings of Fact and Conclusions of Law at 51. We decline the defendants' invitation. The potential adverse effect of a majority vote requirement, lurking in the context of the severe racial bloc voting that exists in Edgefield County, is all but a "theoretic actual operation." It is indeed a present day political reality which black candidates who run under the at-large electoral format must face.

## IX. CONCLUSION AND ORDER

The thrust of the plaintiffs' case is that black citizens of Edgefield County have been denied meaningful access to the political processes under the at-large electoral format used by the Edgefield County School Board in violation of Section 2 of the Voting Rights Act, *as amended*, through a history of racial discrimination resulting in present socio-economic and political disadvantages, a near absence of "elected" black Board members, and the existence of a severe racially polarized voting phenomenon. While the defendants have not substantially controverted the essence of the past history of racial discrimination in Edgefield County, they have attempted to dispel the apparent residual effects of segregation and discrimination by presenting a body of evidence showing improvements in the County schools and living conditions in general in the past few years.

The focus of this lawsuit, however, does not concern whether black children in Edgefield County have received adequate public school education, nor does it involve a determination of the quality of the School Board's performance. Indeed, if we were to take a snapshot view of history that reflects the performance of the School Board, little doubt would enter into our consideration that it has done an admirable job in the past three years. Under the able tutelage of the current school superintendent, Dr. Sam Wooten, the school district has taken an affirmative step to recruit black teachers, has assisted minority teachers to attain more education, has encour-

11. *Cf.* There was a runoff election in District 3 and in District 5 in the Democratic Primary for County Council election in 1976. Each involved a contest between a white and a black candidate. In each of the runoff elections, 97% of the white voters voted for the white candidate and none for his black opponent. Both white candidates won the runoff elections. *See* Pltf. Exh. 195 at 4.

aged both black and white students to participate in all areas of extracurricular activities; and most important of all, has furnished a relatively better quality education to all students as evidenced by the academic achievement test results recently compiled. But, as we prefaced this Opinion, this is a vote dilution case. It concerns a basic issue which this Court repeatedly conveyed during the trial of this case whether the at-large electoral scheme used by the School Board to elect its members results in an impermissible dilution of the voting strength of black voters in Edgefield County, and thus denies them equal access to participate in the County governmental affairs. Evidence that officials have been responsive to the needs of the minorities is of limited importance and does not overcome evidence that the minorities are excluded from political participations. *See* Sen.Rep. No. 97–417, *supra,* at 29 n. 116, 1982 USCAN, *supra,* at 207.

Under the legal standards which we are required to follow in deciding this Section 2 vote dilution case, we find that there is credible and substantial evidence showing that a pervasive racial discrimination has left the County's black citizens economically, socially, and politically disadvantaged and that a severe degree of racial bloc voting and the minimal degree of electoral success by minority candidates exacerbate the difficulties faced by black candidates seeking election to the position of the School Board Trustees under the existing at-large electoral structure and practice. We conclude that under the totality of the circumstances the at-large method of election for membership on the Edgefield County, South Carolina, School Board Trustees results in the denial or abridgement of voting rights of black citizens of Edgefield County of equal opportunity to participate in the political processes and to elect representatives of their choice in violation of Section 2 of the Voting Rights Act, *as amended,* 96 Stat. 134 (1982).

ACCORDINGLY,

IT IS BY THE COURT THEREFORE ORDERED that all future at-large elections for Edgefield County, South Carolina, School Board of Trustees should be and are hereby restrained and enjoined pending the approval by the Court of a constitutionally permissible plan for the election of School Board Trustees;

IT IS FURTHER ORDERED that within twenty-five (25) days from the date this Opinion is filed and docketed by the Office of the Clerk counsel for plaintiffs shall prepare, circulate and submit a Judgment consistent with the findings and conclusions expressed heretofore in this Opinion, Rule 58, F.R.Civ.P.;

IT IS FURTHER ORDERED that within thirty (30) days from the date the Judgment is filed and docketed by the Office of the Clerk defendants shall submit a new apportionment plan and schedule of elections for the School Board Trustees and shall simultaneously seek preclearance of such plan and schedule pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. Sec. 1973c;

IT IS FURTHER ORDERED that the present Edgefield County School Board of Trustees shall continue to perform its functions until such time as a duly constituted School Board is seated pursuant to a plan approved by the Court; and

IT IS FURTHER ORDERED that jurisdiction is retained in this Court for such further proceedings as may be appropriately required.